FILED IN OPEN COURT

7-9-2019

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 3:19-cr- 113 · J · 32JBT

KYLE MARCOTTE

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by
Maria Chapa Lopez, United States Attorney for the Middle District of
Florida, the United States Department of Justice, Criminal Division, Fraud
Section ("Fraud Secton") (hereinafter collectively "government" or the
"United States"), and the defendant, KYLE MARCOTTE, and the attorneys
for the defendant, Henry M. Coxe, III, and Allan F. Brooke II, The Bedell
Firm, mutually agree as follows:

### A.  **Particularized Terms**

1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the
Information.  Count One charges the defendant with Conspiracy to Commit
Money Laundering, in violation of Title 18, United States Code, Sections
1956(h) and 1956(a)(1)(A)(i).

Defendant's Initials _KM_

AF PFCFSAlP3)

2.    <u>Maximum Penalties</u>

Count One carries a maximum sentence of 20 years of imprisonment, a fine of $500,000 or twice the value of the property involved in the transactions forming the basis of this conspiracy charge, a term of supervised release of up to 3 years, and a special assessment of $100 per felony count for individuals. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3.    <u>Elements of the Offense(s)</u>

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

First:    Two or more people agreed to try to accomplish a common and unlawful plan to violate 18 U.S.C. § 1956(a)(1)(A)(i); and

Second:    The Defendant knew about the plan's unlawful purpose and voluntarily joined in it.

4.    <u>Indictment Waiver</u>

The defendant will waive the right to be charged by way of indictment before a federal grand jury.

Defendant's Initials __KM__                    2

5.     No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida and the Fraud Section agree not to charge the defendant with committing any other federal criminal offenses known to the United States at the time of the execution of this agreement.

6.     Chapter Two Base Offense Level Stipulation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's Chapter Two base offense level be calculated at 8 pursuant to USSG § 2S1.1(a)(2).  The parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7.     Chapter Two and Three Calculations – Stipulation

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's Chapter Two and Three guidelines scoring is as follows:

Loss - 2B1.1(b)(1)(L):                          + 22 level increase

1956 Conviction – 2S1.1(b)(2)(B):        +  2 level increase

Acceptance of Responsibility – 3E1.1:  -  3 level decrease

Defendant's Initials _KM_                           3

Total Offense Level (TOL):          29

The parties understand that such an estimate is not binding on the Court, and if the Court calculates the loss differently, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.    Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.4., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the

defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

      9.    Cooperation - Substantial Assistance to be Considered

The defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG § 5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the

Defendant's Initials   _KM_          5

cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

    10.    Use of Information - Section 1B1.8

    Pursuant to USSG § 1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of the defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG § 1B1.8(b).

    11.    Cooperation - Responsibilities of Parties

    a.    The government will make known to the Court and other relevant authorities the nature and extent of the defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative

Defendant's Initials  _tM_                6

intent by assuming the fundamental civic duty of reporting crime.  However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.  It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)  The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)  The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending

Defendant's Initials _K/M_                7

in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by rescission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books,

Defendant's Initials _KM_                                    8

papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which the defendant hereby agrees to plead in the instant case but, in that event, the defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12.     Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1), whether in the possession or control of the United States, the defendant, or defendant's nominees.  The assets to be forfeited specifically include, but are not limited to, the following:  the $10,220,281.42 in proceeds the defendant admits he obtained, as the result of the commission of the offense(s) to which the defendant is pleading guilty.

The defendant acknowledges and agrees that (1) the defendant obtained $10,220,281.42 as a result of the commission of the offense(s) and (2) as a

Defendant's Initials _K/M_                9

result of the acts and omissions of the defendant, the proceeds not recovered

by the United States through the forfeiture of the directly traceable assets listed

herein have been transferred to third parties and cannot be located by the

United States upon the exercise of due diligence.  Therefore, the defendant

agrees that, pursuant to Title 21, United States Code, Section 853(p), the

United States is entitled to forfeit any other property of the defendant

(substitute assets), up to the amount of proceeds the defendant obtained, as the

result of the offense(s) of conviction and, further, the defendant consents to,

and agrees not to oppose, any motion for substitute assets filed by the United

States up to the amount of proceeds obtained from commission of the

offense(s).

The Defendant expressly consents to the forfeiture of the following

substitute assets:

a.  Real property including all improvements thereon and
    appurtenances thereto, located at 315 12th Street, Atlantic
    Beach, FL 32233, more particularly described as:

    A Portion of Lot 25, Block 1, as shown on map of Selva
    Marina Unit No. 1, as recorded in Plat Book 23, Page 4, of
    the current public records of Duval County, Florid and
    being ore particularly described as follows:

    For a point of beginning, commence at the Southeasterly
    corner of said Lot 25, said point being situate in the curved
    Northerly right of way line of 12th Street (A 60 foot right of
    way as now established), said curved Northerly right of
    way line being concave Northwesterly leading

Defendant's Initials _KM_                    10

Southwesterly and having a radius of 924.92 feet; from the point of beginning thus described; thence Southwesterly along and around said curved right of way line, an arc distance of 75.02 feet; said arc being subtended by a chord bearing and distance of South 78 degrees 19' 41" West 75.00 feet; thence North 06 degrees 15' 23" West, departing said curved right of way line, a distance of 35.05 feet; thence North 01 degrees 08' 54" West, a distance of 107.40 feet; to a point situate on the line dividing said Lot 25 and Lot 26, Block 1 of said Selva Marina Unit No. 1; thence North 83 degrees 42' 00" East, along said diving line, a distance of 65.00 feet to a point on the line dividing said Lot 25 and Lot 24, Block 1 of said Selva Marina Unit No. 1, said point also being the Northeasterly corner of said Lot 25; thence South 06 degrees 18' 00" East, along last said dividing line, a distance of 135.00 feet to a point situate in said curved Northerly right of way lie of 12th Street and the Point of Beginning.

Assessor's Parcel No: 171910-0015.

The net proceeds from the forfeiture and sale of any specific asset(s) will be credited to and reduce the amount the United States shall be entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence and the United States shall not be limited to the forfeiture of the substitute assets, if any, specifically listed in this plea agreement.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, judicial or administrative forfeiture action. The defendant consents to the filing of a motion by the United States

Defendant's Initials _KM_                    11

for immediate entry of an Order of Forfeiture of proceeds and a Preliminary Order of Forfeiture for Substitute Assets.

The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's

Defendant's Initials _K M_                    12

sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years.  The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing.  In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may

Defendant's Initials ___KM___                13

be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.  However, pursuant to 21 U.S.C. § 853(i), the Attorney General of the United States is authorized to restore forfeited property to certain victims of federal crimes.  The Attorney General has delegated this authority to the Chief of the Money Laundering and Asset Recovery Section, United States Department of Justice (MLARS) and the granting or denial of restoration requests rests solely within the discretion of MLARS.  The determination of whether a victim may receive restoration is governed by the regulations found in 28 C.F.R. § 9.8(b).  If the requirements of 28 C.F.R. § 9.8 are met and appropriate internal approvals are obtained, the United States will recommend to MLARS that property forfeited in this case be restored to victims.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this

Defendant's Initials ___Km___          14

agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.    Standard Terms and Conditions**

    1.    Restitution, Special Assessment and Fine

    The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

Defendant's Initials _Km_        15

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen will be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant

Defendant's Initials _KM_              16

factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which the defendant pleads, to respond to comments made by the defendant or the defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.   Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his/her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he/she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the

Defendant's Initials  _KM_          17

United States Attorney's Office and the Fraud Section to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States Attorney's Office and the Fraud Section to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

    6.   <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the

government are not binding on the Court and that, should any recommendations be rejected, the defendant will not be permitted to withdraw the defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

      7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal the defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is

Defendant's Initials  _K  _       19

released from the waiver and may appeal the sentence as authorized by 18

U.S.C. § 3742(a).

    8.    <u>Scope of Agreement</u>

    It is further understood that this agreement is limited to the Office of the

United States Attorney for the Middle District of Florida and the Fraud

Section, and cannot bind other federal, state, or local prosecuting authorities,

although the undersigned will bring the defendant's cooperation, if any, to the

attention of other prosecuting officers or others, if requested.

    9.    <u>Filing of Agreement</u>

    This agreement shall be presented to the Court in open court, and filed

in this cause, at the time of the defendant's entry of a plea of guilty pursuant

hereto.

    10.    <u>Voluntariness</u>

    The defendant acknowledges that the defendant is entering into this

agreement and is pleading guilty freely and voluntarily without reliance upon

any discussions between the attorney for the government and the defendant

and the defendant's attorney and without promise of benefit of any kind (other

than the concessions contained herein), and without threats, force,

intimidation, or coercion of any kind.  The defendant further acknowledges

the defendant's understanding of the nature of the offense or offenses to which

Defendant's Initials _*KM*_        20

the defendant is pleading guilty and the elements thereof, including the penalties provided by law, and the defendant's complete satisfaction with the representation and advice received from the defendant's undersigned counsel (if any).  The defendant also understands that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that the defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against the defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in the defendant's defense; but, by pleading guilty, the defendant waives or gives up those rights and there will be no trial.  The defendant further understands that if the defendant pleads guilty, the Court may ask the defendant questions about the offense or offenses to which the defendant pleaded, and if the defendant answers those questions under oath, on the record, and in the presence of counsel (if any), the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.  The defendant also understands that the defendant will be adjudicated guilty of the offenses to which the defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

Defendant's Initials _KM_            21

11.   <u>Factual Basis</u>

The defendant is pleading guilty because the defendant is in fact guilty. The defendant certifies that the defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or the defendant's attorney with regard to such guilty plea.

13.   Certification

The defendant and the defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this __8th__ day of __July__ 2019.

MARIA CHAPA LOPEZ
United States Attorney

_Kyle Marcotte_
Kyle Marcotte
Defendant

_Tysen Duva_
Tysen Duva
Assistant United States Attorney

_Henry M. Coxe, III_
Henry M. Coxe, III
Bedell Firm
Attorney for Defendant

_Frank M. Talbot_
Frank M. Talbot, II
Assistant United States Attorney
Chief, Jacksonville Division

_Allan E. Brooke II_
Allan E. Brooke II
Bedell Firm
Attorney for Defendant

ROBERT ZINK
Acting Chief
Criminal Division
Fraud Section

_Joe Beemsterboer_
Joseph S. Beemsterboer
Deputy Chief
Criminal Division
Fraud Section

Gary A. Winters
James V. Hayes
Trial Attorneys
Fraud Section

Defendant's Initials __KM__                23

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:19-cr-113 · J · 32JBT

KYLE MARCOTTE

PERSONALIZATION OF ELEMENTS

1.      Between on or about September 1, 2016 and August 10, 2018,

did you and at least one other person try to accomplish a common and

unlawful plan to violate 18 U.S.C. § 1956(a)(1)(A)(i), that is engaging in

financial transactions to promote or carry on a fraudulent pass-through billing

scheme?

2.      Did you know the unlawful plan's purpose and willfully join in

it?

Defendant's Initials _____ K M                    24

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 3:19-cr- 113-J-32JBT

KYLE MARCOTTE

FACTUAL BASIS[1]

In 2015, Person B, the owner of a billing and software business
(Company A) and Person C, the CEO of a hospital management company
(Company B), embarked on a fraudulent scheme with laboratory owners and
others to obtain reimbursements from private health insurance companies for
urine drug tests (UDTs) by billing those tests through rural hospitals, in order
to take advantage of the high rates of reimbursement for UDTs conducted at
in-network rural hospitals.

**The Pass-Through Billing Scheme at Campbellton Graceville**
**Hospital and Regional General Hospital**

In May 2015, Company B obtained control of Campbellton Graceville
Hospital (Campbellton Graceville), a rural hospital in Graceville, Florida, by
entering into a management agreement with Campbellton Graceville's Board

---

[1] The Factual Basis is prepared by the United States.  The factual basis does not
include all pertinent or known facts concerning the charge and guilty plea, or all facts
that the defendant has knowledge of.  The factual basis is merely a set of facts
designed to set forth sufficient information that the Court uses to determine if there is
indeed a factual basis to accept the defendant's guilty plea.

Defendant's Initials ___KM___

of Directors.  Person B, who functioned as CEO of Company A and a vice president of Company B, installed Company A's billing software at the hospital and took over laboratory billing for the hospital.

Campbellton Graceville was a Critical Access Hospital ("CAH"), a designation established in the Balanced Budget Act of 1997 to provide certain benefits, such as the opportunity to obtain Medicare cost reimbursement, to small, rural hospitals.  CAHs also typically had favorable reimbursement contracts with private insurers, which were designed to ensure that hospitals in these rural areas remained financially viable.

Laboratory A was a laboratory located near Miami that was owned and operated by Person A.  Beginning in or around November 2015, Person A, Person B, and Person C entered into written and unwritten agreements for Laboratory A to conduct UDTs for patients receiving substance abuse treatment and/or for urine specimens to be directed to Campbellton Graceville for such testing, and for Company A to submit claims for reimbursement for those UDTs to private insurance companies under Campbellton Graceville's favorable contract rates, using Campbellton Graceville's billing credentials, specifically, its National Provider Identification (NPI) number and Tax Identification number.  This

Defendant's Initials  Km                2

arrangement was referred to as Campbellton Graceville's "reference lab program." Subsequently, additional laboratories participated in the program.

The UDTs that Person A, Person B and Person C caused to be performed under the aforementioned arrangement were for patients at substance abuse treatment centers, residents of sober homes, and others who were required to have regular UDTs to determine the presence or absence of controlled substances. These patients, located in Florida and other states around the country, were not inpatients or outpatients at Campbellton Graceville, as required to bill for and take advantage of favorable reimbursement contracts with private insurance carriers. Furthermore, these patients were not even from the community surrounding Campbellton Graceville. Campbellton Graceville primarily "accessioned" the urine samples – that is, employees in Campbellton Graceville's lab received samples and entered patient and insurance data into a computer database that tied to Company A's billing system.

Person A, Person B and Person C caused Company A to submit claims to insurance companies using Campbellton Graceville's NPI and Tax ID numbers, without disclosing that testing had taken place at Laboratory A or that the patients for whom the UDTs were performed had no connection to Campbellton Graceville, thereby making materially fraudulent representations

and omissions about the nature of the testing in order to obtain reimbursement under Campbellton Graceville's elevated contracted rates with insurance companies.  Based on these materially false misrepresentations and omissions, insurance companies reimbursed Campbellton Graceville tens of millions of dollars for the UDTs conducted at Laboratory A.

Person B and Person C controlled Campbellton Graceville's bank accounts.  These individuals directed employees at Campbellton Graceville to transfer certain of the insurance proceeds received by Campbellton Graceville to Laboratory A.

Person B also exercised control over Regional General Hospital (Regional General), a rural hospital in Williston, Florida with favorable reimbursement contracts with insurers.  At Regional General, Person A and Person B engaged in an arrangement similar to the one described above, in which UDTs were tested at Laboratory A and billed to insurance companies using Regional General's billing credentials, in order to receive Regional General's high contracted rates of reimbursement.

### Involvement of MARCOTTE and his Companies

Kyle MARCOTTE was the owner of Beaches Recovery, a substance abuse treatment facility in Jacksonville Beach, Florida, in the Middle District of Florida.  In approximately August 2015, MARCOTTE and Person A

Defendant's Initials  _Km_               4

agreed that Beaches Recovery would send its patients' urine samples to Laboratory A for UDTs to be performed, in exchange for 40% of the insurance reimbursements received by Laboratory A.  MARCOTTE and another individual set up a company, North Florida Labs, to receive these reimbursements from Laboratory A, and established bank accounts in North Florida Labs' name at JP Morgan Chase in Jacksonville, Florida.

MARCOTTE, utilizing his contacts in the substance abuse treatment industry, subsequently brokered deals between Laboratory A and numerous other substance abuse treatment facilities around the country, to have Laboratory A test the facilities' urine samples in exchange for a portion of the insurance reimbursements received by Laboratory A.  On these deals, MARCOTTE typically took a 10% commission for himself while the facility typically received 30% of insurance reimbursements received by Laboratory A (in some instances the facility received more or less than 30%).  Person A caused the insurance reimbursements received by Laboratory A, which were obtained through rural hospital billing arrangements with Person B, Person C, and others, to be deposited into bank accounts controlled by MARCOTTE. After receiving instructions from Person A, MARCOTTE was responsible for dividing the money between himself and the treatment facilities.  In October 2015, MARCOTTE set up a second company, KTL Labs, to handle these

Defendant's Initials _KM_                     5

financial transactions, and established bank accounts at JP Morgan Chase in Jacksonville, Florida in KTL Labs' name.

### Termination of Laboratory A's Involvement with Campbellton Graceville and Regional General

In June 2016, Campbellton Graceville's Board of Directors obtained an injunction in state court to oust Company B from its management role. The Board also suspended the reference lab program. Also around June 2016, the Special Investigative Units (SIU) at Insurance Company A and Insurance Company B began to investigate the spike in lab claims coming out of Campbellton Graceville and Regional General. These and other insurers eventually stopped paying lab claims submitted from the two hospitals.

### Person A Controls Chestatee Regional Hospital and Connection with MARCOTTE

At or around the time the reference lab program at Campbellton Graceville was suspended, Person A sought to acquire a rural hospital. In or about June 2016, Person A began to negotiate for the purchase of Chestatee Regional Hospital (Chestatee), a rural hospital in Dahlonega, Georgia. Company C, a limited liability company of which Person A was the sole member, closed on the purchase of Chestatee in mid-August 2016. Thereafter, working with Company D, a billing company, Person A caused claims for UDTs that were performed at Laboratory A and/or at Chestatee, on behalf of

Defendant's Initials _Km_          6

persons who were not inpatients or outpatients of Chestatee or from the area surrounding the hospital, to be submitted to insurance companies using Chestatee's NPI number and Tax ID. As at Campbellton Graceville, the claims were submitted to insurance companies without disclosing that testing had taken place at Laboratory A or that the patients for whom the UDTs were performed had no connection to Chestatee, thereby making materially fraudulent representations and omissions about the nature of the testing in order to obtain reimbursement under Chestatee's elevated contracted rates with insurance companies. Based on these materially false misrepresentations and omissions, insurance companies reimbursed Chestatee tens of millions of dollars for the UDTs. This occurred from approximately September 2016 through March 2018, when the billing stopped due to an investigation by an insurance company's SIU.

During the period of time Person A billed UDTs through Chestatee, Person A continued to obtain urine samples sourced through MARCOTTE in a manner similar to how samples had been sourced when UDTs were billed through Campbellton Graceville and Regional General. MARCOTTE supplied Beaches Recovery's urine to Laboratory A in exchange for North Florida Labs receiving 30% of the insurance reimbursements, and MARCOTTE and certain sales representatives receiving portions of 10% of

Defendant's Initials _Kn_            7

the reimbursements for brokered deals with other substance abuse treatment facilities, while the facilities typically received 30%.

### Financial Transactions Involving Fraudulently Obtained Funds

When Person A acquired Chestatee, Person A billed insurance companies, specifically using Chestatee to falsely obtain insurance reimbursements for UDTs to which Person A was not otherwise entitled. Person A told Marcotte that Chestatee was "in network" with insurance companies and that insurance companies would pay claims if Chestatee was referenced in the claims. Person A told Marcotte that if Person A submitted claims to insurance companies referencing Laboratory A as the testing laboratory, this was "out of network," and different reimbursement rates would apply or claims would not be paid. Based on MARCOTTE's agreements with Person A to accept a percentage of the insurance reimbursements in exchange for sending Beaches Recovery's urine samples to Laboratory A, and brokering deals with numerous other treatment centers to send their urine samples to Laboratory A, MARCOTTE understood kickbacks were paid to induce the continued supply of urine samples. Those urine samples were billed to insurance companies through Chestatee, using its favorable reimbursement contracts.

Defendant's Initials _KM_          8

As a result of the fraudulent insurance billings, Chestatee began receiving large payments from insurance companies in or about September 2016. Person A caused Chestatee to transfer a substantial portion of those proceeds to a bank account controlled by Laboratory A and to other bank accounts controlled by Person A. Subsequently, Person A caused proceeds to be transferred from Laboratory A's bank account and other bank accounts Person A controlled to bank accounts for KTL Labs and North Florida Labs. From approximately September 1, 2016 through approximately August 2018, Person A caused approximately $57,378,628.85 of insurance proceeds to be deposited in KTL Labs and North Florida Labs' bank accounts in Jacksonville, Florida.

### Downstream Financial Transactions by MARCOTTE

During that same timeframe, after KTL Labs received insurance proceeds from Laboratory A and other entities controlled by Person A, MARCOTTE caused certain of those proceeds to be transferred, through Automatic Data Processing ("ADP"), to individuals and companies that controlled the substance abuse treatment facilities for which MARCOTTE had brokered deals with Person A. MARCOTTE caused almost $50 million in payments to be made from KTL Labs' bank accounts through ADP to at least 88 companies and individuals. MARCOTTE also transferred funds from

Defendant's Initials ___K𝓂___          9

KTL Labs to investment accounts he controlled, and engaged in financial

transactions in order to purchase real estate and items of real property.  From

September 1, 2016 through August 2018, MARCOTTE retained

approximately $10,220,281.42.

Defendant's Initials _KM_              10